# FORMAN HOLT ELIADES & RAVIN LLC
## ATTORNEYS AT LAW

Charles M. Forman**
Michael E. Holt**
Daniel M. Eliades*
Stephen B. Ravin**
Erin J. Kennedy***
Joseph M. Cerra**
Kim R. Lynch**
William L. Waldman**
David S. Catuogno***
Harry M. Gutfleish**
Kristin T. Mihelic****
Kimberly J. Salomon**
Robert H. Johnson***
Jonathan S. Bodner***
Dipesh Patel**

OF COUNSEL
Ann M. LaCarrubba***
William A. Calandra*

MEMBER NJ & PA BAR*
MEMBER NJ & NY BAR**
MEMBER NJ BAR***
MEMBER NY & PA BAR****

www.formanlaw.com
firm@formanlaw.com

REPLY TO PARAMUS

November 9, 2009

**Via ECF and Overnight Mail**
The Honorable Judith H. Wizmur, U.S.B.J.
United States Bankruptcy Court
401 Market Street
Camden, New Jersey 08101

Re:   **GDI Management Three Inc.
       Case No.: 09-37378 (JHW)**

       **GDI Management-Four, Inc.
       Case No.: 09-37421 (JHW)**

       **Hearing/Decision Date: November 12, 2009 at 4:30 p.m.**

Dear Judge Wizmur:

On November 2, 2009, Your Honor conducted a hearing on the motions of Saladworks, LLC and Saladworks Development, Inc. (collectively, "Saladworks") for a determination that certain agreements are not property of the above referenced bankruptcy estates or, in the alternative, for relief from the automatic stay authorizing Saladworks to terminate those agreements (the "Motions"). A decision on the Motions is scheduled to be rendered on November 12, 2009. While Saladworks continues to pursue all of the arguments raised in the pleadings submitted in support of the Motions, this letter is submitted to clarify certain of the issues raised at the hearing.

A.    **The Termination Notices were properly issued.**

Each Franchise Agreement[1] provides that the agreements shall terminate automatically upon delivery of a written notice of termination by franchisor to franchisee if the franchisee or its owners, officers or managers:

*"Abandons or fails or refuses to actively operate the Franchises Restaurant for two (2) business days in any twelve month period . . ."* (Section XVI B 5)

*"Surrenders or transfers control of the operation of the Franchised Restaurant . . ."* (Section XVI B 6); or

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motions.

80 Route 4 East, Suite 290          888 7th Ave., Suite 4500          664 Chestnut Ridge Road          1615 Jackson Street
Paramus, NJ 07652                    New York, NY 10106                Spring Valley, NY 10977          Philadelphia, PA 19145
T 201.845.1000                       T 212.707.8500                    T 845.371.3451                   T 215.925.7191
F 201.845.9112                       F 212.707.8511                    F 845.371.7667                   F 215.925.7192

The Honorable Judith H. Wizmur, U.S.B.J.
November 9, 2009
Page 2

*"Commits any affirmative act of insolvency..."* (Section XVI B 8).

The Trustee and the Debtors have conceded that the Restaurants were not open for business on September 30, 2009 because the State of New Jersey, Division of Taxation padlocked both of the Restaurants alleging that the Debtors had not paid approximately $265,000 in sales taxes. See Certification of Carol Jillard in opposition to the Motions.

By letters of October 1 and 2, 2009 (collectively, the "Termination Notices"), Saladworks noticed the franchisees that the Franchise Agreements were *". . . **terminated effective immediately** upon fifteen (15) days from delivery of this notice pursuant to the terms of the Franchise Agreement (which is deemed to be the date of this notice) and the New Jersey Franchise Practices Act."* The Termination Notices stated that the basis for termination was the violation of Sections XVI B 5, 6 and 8 of each Franchise Agreement. There was no opportunity for the franchisees to cure these historical defaults.

At the hearing on the Motions, the Trustee questioned the validity of the Termination Notices based upon the amount of time that the Restaurants had been "dark" when the Termination Notices were issued. The facts, however, do not support the Trustee's argument. The Debtors did **not** conduct business at **all** on September 30 or October 1, 2009. See Certification of Sandee Devine submitted herewith. In fact, the Debtors advised Saladworks on September 30 that the Restaurants had been padlocked by the State of New Jersey and the franchisees would no longer be able to operate as a result thereof. Id. September 30 and October 1, 2009 were each scheduled to be "business days" for the Debtors. Id. Thus, as a matter of uncontested fact, the Debtors failed to operate on September 30 and October 1, 2009, two business days. Therefore, the Termination Notices were both proper under Section XVI B 5 of the Franchise Agreements. The Debtors have now failed to operate either of the Restaurants for nearly forty (40) days.

The Trustee has not questioned the validity of the Termination Notices under Section XVI B 6 or 8. There is no legitimate question about the validity of the Termination Notices under these provisions because, as of the issuance of the Termination Notices, the Debtors had surrendered control of the operation of the franchised Restaurants (satisfying section XVI B 6) and committed act of insolvency (satisfying section XVI B 8) by failing to pay their sales tax and other obligations as they came due.

**B.    The Termination Notices became effective on October 15 and 16, 2009.**

The effective termination dates of each of the Franchise Agreements, October 15/16, 2009, were proper under the New Jersey Franchise Practices Act (the "FPA"). The FPA requires franchisors to provide at least sixty (60) days notice of termination of a franchise agreement, "...except (one) where the alleged grounds are voluntary abandonment by the franchisee of the franchise relationship in which event the aforementioned written notice may be 15 days in advance of such termination..." N.J.S. §56:10-5.[2]

The statute does not define what constitutes "voluntary abandonment" under the FPA. Saladworks is unable to locate any New Jersey case law defining what constitutes "voluntary abandonment" under the

---

[2] It is important to note that the 15 and 60 day notice periods required under the FPA are **not** cure periods. In other words, the FPA does not supersede franchise agreements or law with respect to the ability to cure a default or the time within which a default may be cured. Rather, the notice provisions under the FPA were intended to provide a franchisee with time, if warranted by the circumstances to go into a court of competent jurisdiction to argue that a termination notice was improperly issued.

The Honorable Judith H. Wizmur, U.S.B.J.
November 9, 2009
Page 3

FPA.

Saladworks submits that this factual setting manifests "voluntary abandonment" by the Debtors such that the Franchise Agreements were effectively terminated as of October 15 and 16, 2009. The Debtors chose not to pay sales taxes due to the State of New Jersey.[3] That voluntary act ultimately led to the lock out and cessation of operations and the resulting abandonment by the Debtors of the franchise relationship as contemplated under the FPA.

In Zeidler v. A&W Rest., Inc., 2006 U.S. Dist. LEXIS 42917, at * 9-12 (N.D. Ill. July 6, 2006), the U.S. District Court for the Northern District of Illinois held that closure by a franchisee of a restaurant for 550 consecutive days, with no intention to reopen, amounted to a legal abandonment of the franchise under the Illinois Franchise Disclosure Act, 815 ILL. COMP. STAT. 705/19 (2005). Though Zeidler is decided under Illinois law and the restaurant closure was for a longer period of time, the rationale that abandonment is inferred by a lack of intention of reopen is instructive. **The Debtors actions support the conclusion that the Debtors have abandoned the franchise relationship. The Debtors have not operated the Restaurants for more than a month. The Debtors took no state court action between September 30 and October 15, 2009 to regain possession of their franchised businesses. When the Debtors did file for bankruptcy protection, they did so under chapter 7 as opposed to chapter 11 of the Bankruptcy Code. The Debtors, thus, made a conscious decision not to proceed under chapter 11 and attempt to restore operations as debtors in possession. There can be no other reasonable conclusion than that of voluntary abandonment by the Debtors.**

C.     **Termination is not stayed by the bankruptcy filings.**

The automatic stay does not stay the effective date of termination of the Franchise Agreements, whenever that is determined to be in this case. Although the automatic stay is a broad and powerful provision, it does not stay the passage of time. In re Beck, 5 B.R. 169, 170 (Bankr. D. Hawaii 1980).[4]

The situation in Beck is near identical to the facts in this matter. In Beck, the franchisee, Beck received 60-day notice of termination effective June 14, 1980. After the termination notice was issued but before June 14, 1980, Beck filed a chapter 11 case. The Beck court found that the automatic stay provisions of

---

[3] In the Certification of Carol Jillard in opposition to the Motions, Ms. Jillard states that the State of New Jersey "...forcibly closed the both businesses for delinquent sales tax obligations in the total aggregate amount of approximately $265,000 despite the fact that we were attempting to work out a negotiated payment plan of those estimated sales tax obligations." Certification of Carol Jillard in opposition to the Motions at ¶6.

[4] "A contractual right of termination survives the filing of a petition in bankruptcy." In re Lauderdale Motorcar Corp., 35 R.B. 544, 548 (Bankr. S.D.Fla. 1983) citing Thompson v. Texas Mexican R. Co., 328 U.S. 134, 141 66 S. Ct. 937, 942-43, 90 L.Ed. 1132 (1946). As the Fifth Circuit stated in Schokbeton Industries, Inc. v. Schokbeton Products Corp., 466 F.2d 171, 176 (5th Cir. 1972), once the right under an agreement has "evaporated" by written notice of termination: "neither the mere filing of the arrangement petition nor the referee's order purporting to extend the grace period for the cure of the default, nor a mystical combination of both could effect their recondensation." Lauderdale Motorcar Corp., 35 B.R. at 548. "Although both Thompson and Schockbeton are pre-Code cases, their reasoning has been applied in recent Code cases on facts virtually indistinguishable from those here." Id. citing In re Anne Cara Oil Co., Inc., 32 B.R. 643 (Bankr. D.Mass.1983); In re New Media Irjax, Inc., 19 B.R. 199 (Bankr. M.D.Fla 1982); In re Beck, 5 B.R. 169 (Bankr. D.Haw.1980).

The Honorable Judith H. Wizmur, U.S.B.J.
November 9, 2009
Page 4

Section 362 did not in any way prevent expiration of the license agreements on June 14, 1980.

This principal is beyond serious debate. **"It is well settled that where a contract has no applicable cure period and a termination notice there under is given, to become effective in the future, the filing of a bankruptcy petition does not stop the running of time nor does it prevent the termination of the contract"**. In re Greenville American Limited Partnership, 2000 Bankr. LEXIS 2008 (Bankr. D.S.C. 2000) *citing* Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir.)Cert denied, 469 U.S. 982 (1994); In the matter of New Media Irjax, Inc., 19 B.R. 199 (Bankr. N.D. Fla. 1992); In re Anne Cara Oil Co., Inc., 32 B.R. 643 (Bankr. D.Mass. 1983); Matter of Lauderdale Motorcar Corp., 35 B.R. 544 (Bankr. S.D. Fla. 1983); Edwin M. Lipscomb Farms, Inc., 90 B.R. 422 (Bankr. W.D. MO. 1988); In re Masterworks, Inc. 100 B.R. 149 (Bankr. D.Conn. 1989).

Thus, the Franchise Agreements either: (a) were effectively terminated as of October 15/16, 2009 and are no longer property of the estate as primarily argued by Saladworks; or (b) will terminate automatically sixty (60) days from the issuance of the Termination Notices without the need for any further action by Saladworks (unless this Court grants the alternate relief requested by Saladworks and grants stay relief to terminate the Franchise Agreements immediately).

**D.   The effective date of the termination is irrelevant because there is no opportunity to cure the subject defaults.**

Whether the termination date of the Franchise Agreements is fifteen (15) or sixty (60) days from the issuance of the Termination Notices is of no matter because the Trustee is unable to either assume or assume and assign the Franchise Agreements due to the existence of incurable events of default under those executory contracts. (As argued in the pleadings submitted in support of the Motion, Saladworks contends that there are a number of other reasons why the Franchise Agreements cannot be assumed).

A bankruptcy court order is required for a debtor to assume an executory contract. 11 U.S.C. §365(a). The legislative history indicates that in permitting assumption, bankruptcy courts must protect the non-debtors bargain, including nonmonetary considerations, under all contracts. H.R. Rep. No. 595, 95th Cong. 1st. Sess. 348 (1977), *reprinted in 1978 U.S. Code Cong. Ad. News 5963, 6034-6305.* See also, In re Ionosphere Clubs, Inc., 85 F3d 992 (2nd Cir. 1996) (Congress' intent in imposing cure and adequate assurance conditions on ability of bankruptcy debtor to assume executory contract was to ensure that contracting parties receive full benefit of the bargain if they are forced to continue performance).

Where there has been a default in an executory contract, as with the Franchise Agreements, per 11 U.S.C. §365(b)(1), a debtor or trustee must clear three (3) specific hurdles as a condition of assumption:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure,

The Honorable Judith H. Wizmur, U.S.B.J.
November 9, 2009
Page 5

>   such default;
>
>   (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
>   (C) provides adequate assurance of future performance under such contract or lease.

Each requirement must be complied with before assumption can be approved. See In re Rachels Industries, Inc., 109 B.R. 797, 802 (W.D. Tenn.1990) (*citations omitted*). The party seeking to assume the executory contract bears the burden of proof that the contract is one subject to assumption and that all of the requirements for assumption have been met. Id. Under no circumstances can the Trustee satisfy 11 U.S.C. §365(b)(1)(A). Therefore, if the Court were to determine that the Franchise Agreements have not already been terminated, Saladworks would be entitled to stay relief to terminate them. See e.g., In re Commonwealth Mortgage Co., 149 B.R. 4, 7 (Bankr.D.Mass. 1992) (relief from the automatic stay under section 362(d)(1) appropriate where contract not assumable or assignable by the debtor).

It has long been held that the requirement that all existing breaches must be cured and all provisions of the contract assumed applies both to monetary and non-monetary obligations. In re Carterhouse, Inc., 94 B.R. 271, 273 (Bankr. D. Conn. 1988). Thus, traditionally a contract may not be assumed if there are "incurable" breaches. See, In re Herbert, 806 F. 2d 892-895 (9th Cir.1986) (Ninth Circuit held that where debtor-franchisee failed to continuously operate franchise, default justified termination under relevant law and was incurable; thus, debtor could not assume franchise agreement); Good Hope Reineries v. Benavides, 602 F. 2d 998, 1003 (1st Cir.), *cert. denied*, 444 U.S. 992 (1979) ("[T]o assume an executory contract the trustee obtains only such contractual rights as the debtor had and assumes all burdens to which the debtor was subject . . . If the debtor has committed, or the trustee commits, an incurable breach, the trustee has no continuing rights under the contract."); Lee West Enterprises, Inc., 179 B.R. 204, 206-209 (Bankr. C.D. Cal. 1995); In re Deppe, 110 B.R. 898, 903-904 (Bankr. D. Minn. 1990); In re Toyota of Yonkers, 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1992); see also In re Carterhouse, Inc., 94 B.R. at 273.

Subsequent to the Bankruptcy Reform Act of 1994[5], a majority of courts continued to hold that the existence of an incurable default under a lease or an executory contract is a bar to assumption of said lease or executory contract due to the movant's inability to satisfy the specific statutory requirement of 11 U.S.C. §365(b)(1)(A). See e.g., In re Claremont Acquisition Corp., 113 F. 3d. 1029 (9th Cir. 1997); In re New Breed Realty Enterprises, Inc., 278 B.R. 314 (Bankr. E.D.N.Y. 2002). These courts held that 11 U.S.C. §365(b)(2)(D) does not excuse the debtor from curing nonmonetary defaults, even if they are incurable. Id. See also, In re Liljeberg Enterprises, Inc., 304 F.3d 410, 444-446 (5th Cir 2002)

---

[5] The Bankruptcy Reform Act of 1994 added 11 U.S.C. §365(b)(2)(D).

The Honorable Judith H. Wizmur, U.S.B.J.
November 9, 2009
Page 6

(Fifth Circuit Court of Appeals reversed district court and found that debtor was barred from assuming pharmacy agreement pursuant 11 U.S.C. §365(b)(1)(A) due to incurable default in that agreement resulting from a default in a collateral agreement).

At least one court, however, took an opposite position when interpreting the Bankruptcy Reform Act of 1994 regarding incurable defaults. Eagle Insurance Co. v. Bankvest Capital Corp., 360 F.3d.291 (1st Cir.), cert. denied, 124 S.Ct. 2874 (2004). However, this interpretation is not (no longer) valid as, among other reasons, Congress has codified the statutory interpretation set forth in the line of cases of Claremont[6] via the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") amendments to §§365(b)(1)(A) and (B)(2)(D) – with respect to executory contracts.

BAPCPA amended Section 365(b) to adopt the rationale of Eagle Insurance Co. v. Bankvest Capital Corp. **but only** in situations involving leases of real property. Section 365(b)(1)(A) now provides that the trustee need not cure a default that is a breach "relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time for assumption." If the nonmonetary breach is failure to operate in accordance with a lease of nonresidential real property, the default is cured by operating after assumption in accordance with the lease and by compensating the landlord for any pecuniary losses.

This amendment was accompanied by an amendment to Section 365(b)(2)(D), which now provides that Section 365(b)(1) does not apply to "the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease." These two amendments, taken together, codify Claremont in assumption situations not involving leases of real property.

Subsequent to the enactment of BAPCPA in 2005, with respect to executory contracts, courts have continued to hold that the existence of an incurable default (other than a default related to "any penalty rate or penalty provision relating to" such default) bars assumption or assignment of the executory agreement. In re Empire Equities Capital Corp., 405 B.R. 687 (Bankr. S.D.N.Y. 2009) (most non-monetary defaults are not exempted from the cure requirements of 11 U.S.C. §365(b)(2)(D). 11 U.S.C.

---

[6] In Claremont the debtors, (collectively, "Worthington") were parties to franchise agreements with General Motors Corporation ("GM"). In re Claremont Acquisition Corp., 113 F. 3d. at 1030-1031. On or about November 7, 1994, Worthington ceased operating their automobile dealerships. Id. at 1032. The bankruptcy cases were not filed until November 20, 1994. Id. at 1033. The GM Dealer Agreements allowed GM to terminate the franchise for the failure to operate the business for seven consecutive business days. Id. The Ninth Circuit court held that: "Debtors' failure to operate the dealership for two weeks preceding the bankruptcy filing constituted a nonmonetary default. Moreover, this default is a "historical fact" and, by definition, cannot be cured." Id. (*citations omitted*). In rendering its decision the Ninth Circuit court ruled: "Under the interpretation we adopt today, the §365(b)(2)(D) exception does not apply to Debtors' default. Debtors' failure to operate the franchises for seven consecutive days is not a default of a contractual provision relating to the satisfaction of a penalty rate or the payment of a penalty. Accordingly, Debtors' obligation to cure their default is not excused. Because Debtors are unable to now cure their default, the GM Dealer Agreements may not be assumed and assigned." Id. at 1034-1035.

The Honorable Judith H. Wizmur, U.S.B.J.
November 9, 2009
Page 7

§365(b)(1)(A) requires a cure only of default other than those arising from any failure to perform non-monetary obligations under an expired lease of real property. A debtor must cure most defaults arising from an executory contract that is not a real property lease – both monetary and non-monetary). In re Eagle Creek Subdivision, LLC, 397 B.R. 758 (Bankr. E.D.N.C. 2008) (executory contract could not be assumed because debtor could not cure the historical and material default of failing to complete construction by contract deadline).

The statutory evolution of the incurable default issue was clearly analyzed earlier this year by Judge Gropper:

> Before the enactment of the 2005 Amendments to the Bankruptcy Code, courts disagreed on the effect of the cure requirements of §365 on non-monetary defaults. Compare In re Claremont Acquisition Corp., Inc., 113 F.3d 1029, 1033 (9th Cir. 1997), followed by New Breed, 278 B.R. at 321 (debtor must cure all material non-monetary defaults if cure is impossible, contract cannot be assumed), with Eagle Ins. Co. v. BankVest Capital Corp., 360 F.3d 291, 296-301 (1st Cir. 2004); In re Walden Ridge Dev., LLC 292 B.R. 58, 66-67 (Bankr. D.N.J. 2003) (debtors are relieved from the obligation to cure non-monetary defaults altogether). This division of authority arose in part from the pre-2005 language of §365(b)(2)(D), as the statute was ambiguous as to whether it exempted from cure all non-monetary defaults or just penalty provisions triggered by non-monetary defaults. See 3 Collier on Bankruptcy P 365.05[3][c] (15th ed. Rev. 2008).[7] In 2005 Congress revised the language of §365(b)(2)(D) by including the word "penalty" as a modifier to the word "provision", making it clear that most non-monetary defaults are not exempted from the cure requirements. 11 U.S.C. §365(b)(2)(D).
>
> At the same time, Congress also gave debtors limited relief from the obligation to cure non-monetary pre petition defaults, and it partially overruled the result in Claremont. Congress did so, however, not by rejecting Claremont's statutory reading of §365(b)(d)(D) but by adding new language in §365(b)(1)(A) that requires a cure only of defaults other than those "arising from any failure to perform non monetary obligations under an expired lease of real property." 11 U.S.C. §365(b)(1)(A) (emphasis added).[8] By amending §365(b)(1)(A) only with respect to unexpired leases

---

[7] Prior to the 2005 Amendments, §365(b)(2)(D) exclude from the cure requirements of 365(b)(1)(A) "the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform non monetary obligations under the executory contract or unexpired lease." Some courts read the statute "in the disjunctive, as excusing the debtor's obligation to cure *either* a penalty rate *or* a provision relating to a default arising from a breach of a non monetary obligation. Other courts read it in the conjunctive, as excusing the debtor's obligation to cure penalty rates and penalty provisions arising from a non monetary default." Wolf-Smih, Bankruptcy Reform and Non monetary Defaults-What Have They Done Now?, 24 Am. Bankr. Inst. J. 6 (Aug. 2005) (internal citations omitted). The language of the amended statute is the same with the addition of the word penalty, as follows: "the satisfaction of any penalty rate or penalty provision arising from any …" 11 U.S.C. §365(b)(2)(D) (emphasis added).

[8] Debtors only have limited time to cure such defaults under non-residential real property leases. 11 U.S.C. §365(b)(1)(A).

The Honorable Judith H. Wizmur, U.S.B.J.
November 9, 2009
Page 8

> of real property, however, Congress provided no room fro the contention that non monetary defaults in non-lease executory contracts are exempt from the cure obligation. See 3 Collier on Bankruptcy P 365.05[3][c] ("Personal property leases and nonlease executory contracts are expressly excluded."). As Congress is presumed to act with knowledge of existing judicial precedent when enacting legislation, see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381-82, 102 S. Ct. 1825, 72 L. Ed. 2d 182 (1982), the 2005 amendments thus establish that a debtor must cure most defaults arising from an executory contract that is not a real property lease. Although the parties here have spent many pages arguing whether the Debtor's default is monetary or non monetary, where an executory contract is involved that distinction is no longer of much relevance.

In re Empire Equities Capital Corp., 405 B.R. at 690-691.

The Restaurants have been closed now for over thirty (30) days. These chapter 7 debtors will never again operate the Restaurants. If the Franchise Agreements are not deemed to be terminated already, Saladworks is entitled to immediate stay relief as a matter of law because the Trustee cannot assume (or assume and assign) either of the Franchise Agreements due to the existence of historical incurable defaults.

Respectfully submitted,

Daniel M. Eliades
DME/dmz
cc:    All parties on the attached service list

M:\SALADWORKS, LLC\GDI MANAGEMENT THREE INC\LTRS\Judge Wizmur-02.doc

## SERVICE LIST

| William Mackin, Esq.<br>William Mackin, P.C.<br>105 N. Broad Street<br>P.O. Box 304<br>Woodbury, New Jersey 08096 | John W. Hargrave, Esq.<br>Law Offices of John W. Hargrave<br>117 Clements Bridge Road<br>Barrington, New Jersey 08007 | Teresa M. Munson, Esq.<br>Premier Title Co., LLC<br>34 Lanes Mill Road<br>Brick, New Jersey 08723 |
| --- | --- | --- |